The IRISH LESBIAN AND GAY ORGANIZATION, Plaintiff,

v.

Rudolph W. GIULIANI, in his official capacity as Mayor of the City of New York, William J. Bratton, in his official capacity as Police Commissioner of the City of New York, and The City of New York, Defendants,

New York County Board of the Ancient Order of Hibernians, Defendant–Intervenor.

No. 96 Civ. 1398 (JGK).

United States District Court, S.D. New York.

March 14, 1996.

Jacqueline C. Charlesworth, Brian G. Murphy, Jamie E. Shapiro, and Gerald E. Harper, Paul, Weiss, Rifkind, Wharton & Garrison, New York City, for plaintiff.

Paul A. Crotty, Corporation Counsel of City of New York, Virginia Waters, Gabriel Taussig, Andrew M. Wasserman, Assistant Corporation Counsel, New York City, for defendants.

Ernest L. Mathews, Jr., Maura R. Cahill, Gleason & Mathews, P.C., New York City, for defendant-intervenor.

KOELTL, District Judge:

Plaintiff Irish Lesbian and Gay Organization ("ILGO") brings this action against New York City, its Mayor, and its Police Commissioner (collectively "the City") challenging the denial of ILGO's application for a permit to conduct a parade on March 16, 1996 prior to the annual St. Patrick's Day Parade (the "Parade") conducted by the New York County Board of the Ancient Order of Hibernians (the "AOH"). Specifically, ILGO's permit application sought approval for a group of 1,500 to 2,000 people to march north along Fifth Avenue from 42nd Street to 86th Street—the same route as AOH's parade—starting at 9:30 a.m. Judge John F. Keenan of this Court denied a similar challenge to the City's refusal to grant a substantially similar permit to ILGO last year. *See Irish Lesbian and Gay Org. v. Bratton*, 882 F.Supp. 315 (S.D.N.Y.) ("*ILGO 1995* "), *aff'd*, 52 F.3d 311 (2d. Cir.1995) (table).

ILGO contends that Section 10–110 of the Administrative Code of the City of New York, the provision under which the City purportedly considered and denied ILGO's application, violates the First and Fourteenth Amendments to the United States Constitution both on its face and as applied to ILGO in this instance. ILGO also asserts violations of Article I, Sections 8 and 11 of the New York State Constitution. Seeking injunctive and declaratory relief under 42 U.S.C. § 1983 and 28 U.S.C. § 2201 respectively, ILGO filed the Complaint and brought on a Motion for Preliminary Injunction by Order to Show Cause dated February 26, 1996. The Court denied ILGO's motion for expedited discovery, brought by the same Order to Show Cause, as well as the City's two applications to transfer this case to Judge Keenan and to entertain an interim motion to dismiss prior to consideration of the preliminary injunction motion. *See Irish Lesbian and Gay Org. v. Giuliani*, 918 F.Supp. 728 (S.D.N.Y.1996). Shortly before the hearing on ILGO's motion for a preliminary injunction, AOH moved to intervene and served papers in opposition to the motion, and ILGO submitted papers in response. The Court granted AOH's motion to intervene at the beginning of the hearing on Monday, March 11, 1996.

ILGO now moves for a preliminary injunction pursuant to Fed.R.Civ.P. 65(a) to prevent the City from denying ILGO the permit it seeks. All of the parties submit-

ted extensive papers on the preliminary injunction, and an extensive evidentiary hearing was held before the Court on Monday and Tuesday, March 11–12, 1996. Numerous witnesses testified, and the Court received affidavits, depositions, and documentary evidence. The Court also heard oral argument on the motion. Having considered all of the testimony of the witnesses and the documentary evidence, the submissions of the parties, and the arguments of counsel, and having reviewed the relevant cases and authorities, the Court makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. The St. Patrick's Day Parade is an annual event held in New York City for over two-hundred years. Traditionally, the Parade begins at 44th Street in the late morning and proceeds north along Fifth Avenue to 86th Street. The Parade is usually held on March 17th, the date of the Feast of St. Patrick, unless the 17th falls on a Sunday, as it does this year. Under such circumstances, the Parade is held on the preceding Saturday instead.

2. In recent years, the Parade has attracted over 150,000 participants and more than a quarter-million spectators. It is one of the largest parades in New York City. This year's parade will require about 2,000 police personnel, and the assistance of other city agencies such as Emergency Medical Services, the Department of Sanitation, and the Department of Transportation.

3. ILGO describes itself as a group of lesbians and gay men of Irish descent who formed a group in 1990 to create "a safe and comfortable forum for Irish lesbians and gay men to discuss and address [their] social, cultural and political needs." (Affidavit of Anne Maguire, sworn Feb. 23, 1996, ¶ 2; see Maguire Test., Tr. at 9–10.)

4. Since its inception, ILGO has made repeated efforts to participate in the St. Patrick's Day Parade in New York City. (Maguire Aff., ¶¶ 3, 4, 9–25; Maguire Test., Tr. at 28–34.) None of ILGO's legal challenges have met with success. See ILGO 1995, 882 F.Supp. 315; New York County Bd. of An-

cient Order of Hibernians v. Dinkins, 814 F.Supp. 358 (S.D.N.Y.1993) (Duffy, J.); Irish Lesbian and Gay Org. v. New York State Bd. of Ancient Order of Hibernians, 788 F.Supp. 172 (S.D.N.Y.1992) ("ILGO 1992") (Leval, J.).

5. In the 1992 and 1993 challenges, ILGO sought injunctive relief that would require the City to permit the group to march as a unit in the St. Patrick's Day Parade itself. Judges Leval and Duffy, respectively, denied ILGO's applications. The reasoning of these two decisions anticipated that of the Supreme Court in Hurley v. Irish–American Gay, Lesbian & Bisexual Group of Boston, —— U.S. ——, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995).

6. In 1995 ILGO brought an Article 78 petition in New York Supreme Court to compel the New York Police Department ("NYPD") to issue ILGO a permit to conduct its own parade at 8:30 a.m. on the same day, Friday, March 17, 1995, and along the same route as the 1995 St. Patrick's Day Parade. The petition was removed to federal court, and Judge Keenan denied the injunction and dismissed the complaint. See ILGO 1995, 882 F.Supp. at 321.

7. The 1996 Parade is scheduled for Saturday, March 16, 1996 at 11:00 a.m. along its traditional route. The AOH, the sponsor of the Parade, received a permit to conduct this year's parade on February 23, 1996. (See Pl.'s Ex. 3; Defs.' Ex. 4.)

8. On or about October 11, 1995, ILGO submitted to the City its application for a parade permit for a group of 1,500 to 2,000 people to march north along Fifth Avenue from 42nd Street to 86th Street starting at 9:30 a.m. on March 16, 1996. (Maguire Aff. Ex. B.; Defs.' Ex. 5.)

9. It is undisputed that the ILGO parade would take place on the same day, along the same route, on the same street, and for the same distance as the St. Patrick's Day Parade. The only difference is that ILGO's parade would begin at 9:30 a.m., and the St. Patrick's Day Parade is scheduled to begin at 11:00 a.m. Nevertheless, it is clear that the necessary preparations for the St. Patrick's

Day Parade will overlap the parade ILGO wants to conduct in both time and location.

10. According to John T. Dunleavy, Chairman of the AOH Parade Committee, (*see* Affidavit of John T. Dunleavy, sworn Mar. 9, 1996), and the testimony of Lieutenant Dennis J. Cirillo, the commanding officer of the Manhattan South Operations Unit of the NYPD in charge of planning and preparation of parades and demonstrations, (Cirillo Test., Tr. at 241–57), preparation for the March 16, 1996 St. Patrick's Day Parade includes the following, (*see also* Defs.' Exs. 7, 9):

   a. At 7:00 a.m. 51st Street is closed to traffic from Madison Avenue to Fifth Avenue.

   b. At 7:30 a.m. the streets from 44th to 48th Streets are closed to traffic from Sixth Avenue to either Vanderbilt Avenue or Park Avenue. The various parade participants use these streets as formation areas prior to the Parade.

   c. At 8:00 a.m. pedestrian barricades are erected around St. Patrick's Cathedral to facilitate the flow of people in and out of the Cathedral.

   d. Prior to the Mass at the Cathedral, at about 7:45 a.m., the 400–500 members of the 69th Regiment of the National Guard marches from a staging area at 39th Street north along Fifth Avenue to the Cathedral. The Mass begins at approximately 8:30 a.m.

   e. Parade spectators begin to arrive at or near the parade route starting from about 9:00 a.m. continuing throughout the morning.

   f. At about 9:15 a.m. Fifth Avenue is closed to traffic from 41st Street to 57th Street. At the conclusion of the Mass, at approximately 9:15 a.m., the 69th Regiment reassembles outside of the Cathedral at 51st Street on Fifth Avenue and marches south to their staging area at 39th Street. Fifth Avenue is reopened to traffic at the conclusion of this march at approximately 9:45 a.m.

   g. Other attendees from the Mass who may be dignitaries participating in the Parade proceed south along Fifth Avenue to the formation area at 44th Street. Others proceed north toward the official reviewing stand at 64th Street.

   h. Throughout the remainder of the morning, parade participants assemble in prearranged locations at the formation streets from 44th Street to 48th Street.

   i. At about 9:45 a.m. barricades are erected along the entire parade route from 44th Street to 86th Street on Fifth Avenue.

   j. At 10:00 a.m. pedestrian chutes are erected at several locations along the parade route to facilitate pedestrian traffic crossing Fifth Avenue until the conclusion of the Parade.

   k. At 10:30 a.m. 50th Street is closed to all traffic except crosstown city busses. Fifth Avenue is again closed to all traffic, and the streets between Madison Avenue and Central Park from 60th Street to 85th Street are closed as well.

   *l.* At 10:45 the 69th Regiment begins to march north from their staging area at 39th Street. The Regiment pauses at 44th Street until 11:00 a.m. and then proceeds up Fifth Avenue followed by the parade participants who have assembled in the formation areas in the streets off Fifth Avenue.

11. The City denied ILGO's permit request on February 13, 1996. The City explains that the permit was denied because two parades cannot be conducted at the same location on the same day at the same time. The City maintains that allowing two simultaneous parades would create unacceptable levels of traffic congestion and impose unmanageable burdens on police, sanitation, and emergency medical services.

12. The NYPD copy of ILGO's permit application bears two endorsements. The first is by Assistant Chief Allan H. Hoehl, dated January 25, 1996, prepared by Cirillo as denoted by the initials "DJC" appearing at the lower left. The endorsement reads in relevant part: "Contents noted. There is an

annual event scheduled for this date in Patrol Borough Manhattan South on Fifth Avenue. Recommend DISAPPROVAL." (Defs.' Ex. 5, p. 2.)

13. The second endorsement to the ILGO permit application is signed by Assistant Chief Nicholas Estavillo, dated February 13, 1996, and reads in relevant part: "Contents noted. After conferral with Patrol Borough Manhattan South, due to the St. Patrick's Day Parade on the same route, this permit is DENIED." (Defs.' Ex. 5, p. 3.)

14. The City maintains that is has an administrative practice of not allowing two parades at the same place and time. There is credible and convincing evidence to support the existence of such a policy.

15. Lieutenant Cirillo, the officer with immediate responsibility for processing parade permit applications at Patrol Borough Manhattan South, testified that the first step in evaluating an application is to determine whether there are conflicting events. (Cirillo Test., Tr. at 215–16.) Cirillo explained that only one permit is issued for a parade at a given place and time. (Cirillo Test., Tr. at 219–21, 274, 276.) Cirillo further testified that he has eight years of experience reviewing parade permit applications and has processed about 500 applications. (Cirillo Test., Tr. at 215.) Yet Cirillo could recall only one incident when two applicants were granted permits to conduct parades even approaching the same time and place. (Cirillo Test., Tr. at 219–21.) Cirillo recalled that, in that instance, the two parade routes overlapped by only three blocks and the parades were scheduled with a two-hour delay between the dispersal time of the first and the starting time of the second. (Cirillo Test., Tr. at 296–97.) Nevertheless, Cirillo testified, the traffic and logistical problems were unmanageable, and he would not recommend even that approval again. (Cirillo Test., Tr. at 225–26.) Cirillo reaffirmed that NYPD policy at Patrol Borough Manhattan South was to allow only one parade at a given place and time. (Cirillo Test., Tr. at 274.)

16. Lieutenant Sam Centamore, supervisor of the parade section of the NYPD Office of the Chief of Department, Investigation Review Section, and Cirillo's immediate supervisor, also testified that two permit applications requesting a parade for the same time, date, and location are recommended for disapproval. (Centamore Test., Tr. at 99–100, 115.) Centamore testified about several permit applications bearing endorsements denying the permit because of conflicts with other scheduled events. (Centamore Test., Tr. at 106–10; see Defs.' Exs. 12–14, 17–18.) Centamore explained that the reason for not granting two groups a parade permit for the same location and time was because of the strain it would place on NYPD resources and "to protect public safety [and] traffic concerns." (Centamore Test., Tr. at 110.)

17. Assistant Chief Allan Hoehl, commanding officer of Patrol Borough Manhattan South, also testified that parade permits are not granted for two parades occuring at the same time and location, and that this was the reason ILGO's permit application was disapproved. (Hoehl Test., Tr. at 161, 184.)

18. In this case the overwhelming weight of the credible evidence established that the City would not issue any parade permit for the time and place sought by ILGO because of its conflict with the St. Patrick's Day Parade. (See Cirillo Test., Tr. at 258.) Each of the witnesses who participated in the decision also testified credibly that the decision to disapprove ILGO's permit application did not depend on the content of ILGO's speech. (See Centamore Test., Tr. at 102, 107; Hoehl Test., Tr. at 162; Cirillo Test., Tr. at 226, 235, 258.)

19. The evidence demonstrates credibly that the traffic and congestion problems anticipated by the City are reliable and realistic. These conditions impose a significant logistical burden on the City.

20. Although ILGO seeks to distinguish its application this year from its application last year based on the fact that the St. Patrick's Day Parade this year will be held on a Saturday, legitimate traffic and safety concerns persist on a Saturday. More people are likely to attend the Parade because they are off from work. Moreover, there was credible evidence that between 9:00 a.m. and 10:00 a.m. on Saturdays, when ILGO seeks to have its march, there is ordinarily a

greater number of vehicles on Fifth Avenue than on a weekday, and consequently a greater number of vehicles that must be diverted around the parade route. (Pennica Test., Tr. at 358–59, 361, 365.)

21. The occurrence of another parade on the same route as the St. Patrick's Day Parade would cause substantial additional logistical problems for the police who would have to protect that march, close cross-streets that would otherwise have been open, deal with the 69th Regiment marching north, and all the while continue preparations for one of the largest parades in New York City.

22. ILGO argues that conducting its parade just prior to and along the same route as the St. Patrick's Day Parade is the only effective means of communicating its message of protest. Indeed, it is the fact that the St. Patrick's Day Parade attracts so many spectators that makes Fifth Avenue an attractive forum for ILGO. The City has indicated, however, its willingness to offer other reasonable alternatives to ILGO.

23. Through testimony presented to the Court, the City demonstrated its willingness to arrange for an alternative date for ILGO's parade and to provide for stationary protest areas. Chief Hoehl testified that March 17, 1996 was still an available date for a parade. (Hoehl Test., Tr. at 178.) Lieutenant Cirillo identified the possible locations for stationary protest sites, including the west side of Fifth Avenue between 58th and 59th Streets, and the east side of Fifth Avenue between 66th and 67th Streets just north of the reviewing stand. (Cirillo Test., Tr. at 256; see Hoehl Test., Tr. at 160.)

24. With respect to filing this action, Maguire testified that ILGO first discussed its 1996 permit application with its attorneys in late December 1995 or early January 1996, (Maguire Test., Tr. at 45), and contemplated taking legal action by the end of January. (Maguire Test., Tr. at 44.)

25. On January 25, 1996 Lieutenant Cirillo telephoned Maguire to notify her that Patrol Borough Manhattan South was recommending disapproval of ILGO's permit application. Cirillo explained that the reason for the disapproval was the conflict with the St.

Patrick's Day Parade. (Maguire Test., Tr. at 13–14, 52; Cirillo Test., Tr. at 236–37, 287.)

26. By letter dated February 13, 1996, the same date as the second endorsement to ILGO's permit application from Patrol Borough Manhattan North, the NYPD notified ILGO that its permit application had been disapproved. (See Pl.'s Ex. 4; Defs.' Ex. 6.)

27. On March 5, 1996, Assistant Chief Hoehl called Maguire and left a message indicating a desire for the NYPD to meet with ILGO to discuss alternative routes or stationary protest sites. Maguire did not return the call. (Maguire Test., Tr. at 17, 22; Hoehl Test., Tr. at 159.)

## CONCLUSIONS OF LAW

### I.

The standard for granting a preliminary injunction is the familiar two-prong test described by the Court of Appeals for the Second Circuit as a showing of (1) irreparable harm, and (2) either (a) a likelihood of success on the merits, or (b) sufficiently serious questions on the merits and a balance of hardships in the movant's favor. See Waldman Publishing Corp. v. Landoll, Inc., 43 F.3d 775, 779–80 (2d Cir.1994). The parties do not dispute that the potential deprivation of ILGO's First Amendment rights constitutes irreparable injury. See Elrod v. Burns, 427 U.S. 347, 373, 96 S.Ct. 2673, 2689–90, 49 L.Ed.2d 547 (1976); Paulsen v. County of Nassau, 925 F.2d 65, 68 (2d Cir. 1991). Consequently, for purposes of the present motion ILGO must satisfy only the second prong of the preliminary injunction test.

When government action taken in the public interest is involved as it is in this case, the second half of the second prong, the so-called "fair grounds for litigation" standard, is unavailable, and a litigant must demonstrate a likelihood of success on the merits to warrant relief. See Jolly v. Coughlin, 76 F.3d 468, 473 (2d Cir.1996); Plaza Health Laboratories, Inc. v. Perales, 878 F.2d 577, 580 (2d Cir.1989); see also Able v. United States, 44 F.3d 128, 131 (2d Cir.1995) (per curiam). This "higher burden" is appropriate in this case because ILGO challenges the

City's administration of the parade permitting scheme under the Administrative Code and the City's actions are premised on a purported concern for public safety. ILGO does not seriously dispute that it must show that it is likely to succeed on the merits, (*see* Pl.'s Mem. in Support of Prelim.Inj. at 22), and does not present an argument based on the balance of hardships in its papers. Indeed, ILGO at oral argument did not dispute that the appropriate standard is the likelihood of success on the merits. (Tr. at 322.)

This case, however, presents circumstances requiring ILGO to meet an even more demanding standard of proof to obtain the relief its seeks. As the Court of Appeals for the Second Circuit recently explained in *Jolly*, "where (1) the injunction sought 'will alter, rather than maintain, the status quo'— i.e., is properly characterized as a 'mandatory' rather than 'prohibitory' injunction"; or (2) the injunction sought "will provide the movant with substantially all the relief sought, and that relief cannot be undone even if the defendant prevails at a trial on the merits," the moving party must make a "clear" or "substantial" showing of a likelihood of success. *Jolly*, 76 F.3d at 473–74 (quoting *Tom Doherty Assocs., Inc. v. Saban Entertainment, Inc.*, 60 F.3d 27, 33–34 (2d Cir.1995)).

As the City argues, both circumstances warranting the higher standard of clear or substantial likelihood of success on the merits are present in this case. First, ILGO seeks to alter the status quo: the City has not issued a permit, and ILGO seeks to compel it to do so. Accordingly, ILGO seeks a mandatory injunction and must meet the higher standard. Second, and independently, ILGO desires an injunction which, if granted, would compel the City to issue ILGO a permit and allow it to march. This relief is substantially the complete relief ILGO seeks in its complaint. Although it is true that ILGO seeks money damages and other relief that must await a trial on the merits, the primary relief ILGO desires is to march at 9:30 a.m. on March 16, 1996 in protest of its exclusion from the St. Patrick's Day Parade. If the Court grants a preliminary injunction, and if there is no further litigation, ILGO will hold its parade—an event that cannot be undone should the City eventually prevail on the merits at trial. These dynamics warrant the imposition of the higher standard. Judge Leval reached a similar conclusion in connection with ILGO's effort to require the AOH to allow ILGO to participate in the 1992 parade. *See ILGO 1992*, 788 F.Supp. at 175.

In addition, ILGO should not have the benefit of a lower standard of proof on a preliminary injunction because ILGO is guilty of laches. In *ILGO 1992*, Judge Leval found a higher standard of proof was justified because ILGO knew by January 21, 1992 that it would not be allowed to march in the parade but delayed seeking relief. Here, ILGO has been equally dilatory. ILGO consulted with its lawyers at the end of December 1995 or in early January 1996 and certainly could have brought a lawsuit challenging the facial invalidity of the New York City permitting scheme at that time. Moreover, the NYPD informed ILGO on January 25, 1996 that Patrol Borough Manhattan South would recommend that ILGO's 1996 permit application be disapproved. ILGO's delay in bringing this action prejudiced the ability of all of the parties to prepare for and participate in the trial of this matter, and made it particularly difficult for the City and AOH to prepare their cases adequately. ILGO should not profit from its own delay—a tactic it has employed in the past—by gaining the advantage of a more lenient standard of proof than it would have to face at the ultimate trial on the merits. *See ILGO 1992*, 788 F.Supp. at 175. As explained below, however, ILGO has failed to meet even the more lenient standard.

## II.

ILGO argues that the denial of the parade permit is unreasonable and that the reasons the City gives justifying the denial are pretextual, serving only to cover up discrimination based on prejudice against ILGO's members. The City denies that it considered ILGO's point of view when it denied the group a parade permit and contends that it would have denied the permit application from any group that submitted it. The City explains that it denied ILGO's permit appli-

cation because the St. Patrick's Day Parade was already scheduled at the time and place ILGO requested, and that a second parade occurring in the midst of preparations for the St. Patrick's Day Parade could not be permitted. In addition, the City argues that it offered ILGO reasonable alternatives to a protest parade, including both alternative dates or locations for a parade, and has suggested alternative ways for ILGO to protest its exclusion from the St. Patrick's Day Parade itself. For the reasons that follow, I find that ILGO has demonstrated neither a likelihood nor a clear or substantial likelihood of success on the merits of its claim based on denial of the 1996 permit application.

## A.

■■■■ The City initially argues that under the doctrine of collateral estoppel, Judge Keenan's decision last year denying ILGO a preliminary injunction bars ILGO's claim that the denial of this year's permit application was unconstitutional. Collateral estoppel bars a party from bringing a second action to relitigate an issue of fact or law that was actually decided in the first action so long as that party had "a full and fair opportunity to litigate the issue in the prior proceeding and the decision of the issue was necessary to support a valid and final judgment on the merits." *Metromedia Co. v. Fugazy*, 983 F.2d 350, 365 (2d Cir.1992), *cert. denied*, 508 U.S. 952, 113 S.Ct. 2445, 124 L.Ed.2d 662 (1993); *Balderman v. United States Veterans Admin.*, 870 F.2d 57, 62 (2d Cir.1989) (citing *Lawlor v. National Screen Serv. Corp.*, 349 U.S. 322, 326, 75 S.Ct. 865, 867–68, 99 L.Ed. 1122 (1955)). The City argues that ILGO's as-applied challenge to the 1996 permit application denial is indistinguishable from the 1995 denial which Judge Keenan found to be a permissible restriction.

There are certain factual differences in the circumstances of this year's St. Patrick's Day Parade that militate against application of collateral estoppel to ILGO's as-applied challenge. A significant difference between the two parades is that this year's St. Patrick's Day Parade will be held on a Saturday rather than a weekday. As both parties argue, weekdays and weekends pose different traffic and safety concerns: the City argues the difficulties are likely to be more severe on weekends, while ILGO contends they will ease. In addition, the timing of ILGO's proposed parade is different: this year ILGO wants to begin its parade at 9:30 a.m., much closer to the starting time of the St. Patrick's Day Parade, instead of 8:30 a.m. as it had requested last year. In sum, this year's litigation presents factual circumstances that are significantly different from those of last year. Accordingly, Judge Keenan's decision with respect to the denial of ILGO's 1995 permit application has no preclusive effect on the issue of whether the City's regulation as applied to ILGO's 1996 permit application is unconstitutional.

The City's position in last year's litigation is consistent with the finding that ILGO's as-applied claim concerning the 1996 permit denial survives a collateral estoppel challenge. Following the Court of Appeals' affirmance of Judge Keenan's order last year, the City viewed the ruling as limited to the 1995 permit application. In response to ILGO's motion to amend the judgment under Fed. R.Civ.P. 59(a), the City argued that the judgment did not have to be amended because Judge Keenan's ruling applied only to the 1995 permit application and did not extend to future applications. Judge Keenan agreed and clearly indicated the limited nature of his holding in his order denying the Rule 59 motion, explaining that:

> The Court specifically stated at the March 8, 1995 hearing that it could only consider the legality of the denial of a permit for the 1995 parade. ILGO has not yet, to this Court's knowledge, applied for and been denied a permit for future parades. Claims based on possible future permit applications are not ripe, because they concern future events that may not occur.

*Irish Lesbian and Gay Organization v. Bratton*, No. 95 Civ. 1440, 1995 WL 575330, at *1 (S.D.N.Y. Sept. 29, 1995). The City cannot now reasonably argue that Judge Keenan's opinion covered future permit applications after representing last year that it did not.

Accordingly, in view of the alleged changed circumstances, I will consider ILGO's as-

applied challenge to this year's permit application on the merits.

## B.

The question of whether ILGO is entitled to a preliminary injunction on the basis of its as-applied challenge depends upon whether ILGO has demonstrated a clear or substantial likelihood of success on the merits. After an independent review of the evidence before me, I find that ILGO has not begun to show even a likelihood of success on its as-applied challenge, much less a likelihood that is clear or substantial.

■ The merits of ILGO's as-applied challenge center on the three-part test applied to restrictions on constitutionally protected speech. It is undisputed that ILGO's members have a First Amendment right to celebrate their Irish heritage and their pride in their sexual orientation as well as their moral outrage at their exclusion from the St. Patrick's Day Parade that AOH sponsors. ILGO's right to express its view is not unfettered, however. First Amendment rights are subject to reasonable time, place, and manner restrictions that further significant government interests. *Ward v. Rock Against Racism*, 491 U.S. 781, 791, 109 S.Ct. 2746, 2753–54, 105 L.Ed.2d 661 (1989); *Johnson v. Bax*, 63 F.3d 154, 158 (2d Cir.1995); *Olivieri v. Ward*, 801 F.2d 602, 605 (2d Cir. 1986), *cert. denied*, 480 U.S. 917, 107 S.Ct. 1371, 1372, 94 L.Ed.2d 687 (1987). Such restrictions must be content-neutral, narrowly tailored to serve a significant government interest, and leave open ample alternative means of expression. *Rock Against Racism*, 491 U.S. at 791, 109 S.Ct. at 2753–54; *Olivieri*, 801 F.2d at 605.

■ The speech restriction in this case is the City's refusal to grant ILGO a permit to conduct a parade at 9:30 a.m. along Fifth Avenue from 42nd Street to 86th Street on Saturday, March 16, 1996. The City argues that the permit was denied because there is a parade already scheduled for that date and location at substantially the same time, and because the City does not grant permits for conflicting parades on the same day at the same location. ILGO argues that this reason is not supported by the evidence and that the City could easily accommodate a second parade prior to the St. Patrick's Day Parade.

The evidence in this case supports the City's argument that the denial of ILGO's permit application was not based on the content of ILGO's message. The denial was made pursuant to authority granted to the Police Commissioner under Administrative Code § 10–110 and the Police Department's Administrative Guide Procedure 321–14 interpreting that provision. (*See* Pl.'s Ex. 5; Defs.' Ex. 1.) Neither the permitting ordinance nor the interpretive regulation reveal any content-based considerations. Moreover, as Judge Keenan explicitly noted last year, § 10–110 is content-neutral on its face. *See ILGO 1995*, 882 F.Supp. at 319.

The great weight of the credible evidence before me indicates that the denial of ILGO's permit application was based on the fact that ILGO's parade would conflict directly with the preparations for the St. Patrick's Day Parade and that the permit would have been denied if it had been submitted by any group, irrespective of any message espoused by the applicant.

The City presented credible evidence that the denial of ILGO's permit application stemmed from the logistical problems that would result from permitting two parades at substantially the same time and place. Several representatives from the NYPD who participated in the decision to disapprove ILGO's application testified about the concern for increased traffic congestion, the strain on the City's resources, the necessity for additional street closings, and other public safety issues that would have occurred if ILGO's permit were approved. Lieutenant Cirillo, who is in charge of parade permits at Patrol Borough Manhattan South, testified credibly and convincingly that the parade ILGO contemplated would interfere with preparations for the St. Patrick's Day Parade in many ways and would thereby exacerbate traffic and public safety difficulties.

A particular logistical problem that ILGO's proposed parade poses is that the time and place of its route would place it in direct conflict with the 69th Regiment's march. On Saturday morning, the 69th Regiment will

begin marching from St. Patrick's Cathedral and progress south along Fifth Avenue to its staging area south of 42nd Street. This march will occur from approximately 9:15 a.m. to 9:45 a.m.—a period during which ILGO seeks to march north on Fifth Avenue. In other words, ILGO seeks a permit to allow it to march directly into the 69th Regiment. The inevitable collision of the two groups presents a logistical problem that ILGO neither acknowledges nor concedes.[1]

In addition, there is no credible evidence that the City considered the content of ILGO's message in denying ILGO's permit application. The evidence establishes that the City would not have granted a permit to any other group seeking to march at the time and place sought by ILGO because of the conflict with the St. Patrick's Day Parade, regardless of the content of that group's message. To support its contention, the City submitted a disapproved parade application from the New York Road Runners Club to hold a race that would have conflicted with the Brooklyn St. Patrick's Day Parade. Although each of the NYPD witnesses acknowledged the potential for unruliness in the crowd if ILGO were permitted to march, these witnesses also testified convincingly that their awareness of this potential was not the reason for denying ILGO a permit. The police witnesses testified that they had protected the safety of ILGO members in the past and would be capable and prepared to protect ILGO this Saturday if the Court grants the group permission to march. In sum, there is no evidence that the City disapproved ILGO's permit *because* of the potential for disruption. *See ILGO 1995,* 882 F.Supp. at 319. This is simply not a case of a "heckler's veto," as ILGO contends. There is no evidence that ILGO's permit was de-

nied because of the reaction spectators or parade participants might have. Rather, the evidence shows that *any application* for a conflicting parade, such as the one ILGO described in its permit application, would be denied irrespective of the content of any message an applicant wished to project.

Accordingly, I find that the City's restriction on ILGO's First Amendment rights by denying its parade permit application is content-neutral.

### C.

█ The second inquiry is whether the City's restriction on ILGO's First Amendment rights is narrowly tailored to serve a significant government interest. There is no doubt that the City has an interest in public safety and in guarding against unsafe traffic and street conditions. *See Cox v. Louisiana,* 379 U.S. 536, 558, 85 S.Ct. 453, 466, 13 L.Ed.2d 471 (1965); *Cox v. State of New Hampshire,* 312 U.S. 569, 576, 61 S.Ct. 762, 765–66, 85 L.Ed. 1049 (1941). Indeed, the NYPD is under a mandate to protect the public welfare in this respect. *See* New York City Charter § 435.[2] The City's policy of denying permits for parades at the same time and place is a narrowly tailored approach to avoiding the obvious logistical difficulties that arise when two parades overlap or conflict. As the Supreme Court has noted, "two parades cannot march on the same street simultaneously, and government may allow only one." *Grayned v. City of Rockford,* 408 U.S. 104, 115, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972). The government's obvious authority to refuse a parade permit to a conflicting parade has been repeatedly affirmed. *See Gay and Lesbian Americans v. Bratton,* No. 94 Civ. 4515 (S.D.N.Y. June 24, 1994) (Patterson, J.) (transcript of hear-

---

1. Judge Keenan noted the unavoidable confluence of the two parading groups in his decision last year. *See ILGO 1995,* 882 F.Supp. at 318. ILGO has apparently responded to this problem by moving their projected starting time ahead to 9:30, virtually guaranteeing the two groups will *attempt to occupy the same place at the same* time.

2. Section 435 provides in relevant part:
    The police department and force shall have the power and it shall be their duty to preserve the

public peace ... disperse unlawful or dangerous assemblages and assemblages which obstruct the free passage of public streets, sidewalks, parks, and places; protect the rights of persons and property, guard the public health, preserve order at ... all public meetings and assemblages; [and] ... control and restrict the movement of ... pedestrian traffic for the facilitation of traffic and the convenience of the public as well as the proper protection of human life and health...."

ing); *ILGO 1995*, 882 F.Supp. at 320 (" 'society's interests in order dictate that all groups seeking to parade cannot do so at the same time or place' " (quoting *Gay Veterans Ass'n, Inc. v. American Legion*, 621 F.Supp. 1510, 1517 (S.D.N.Y.1985)); *We've Carried the Rich for 200 Years, Let's Get Them Off Our Backs—July 4th Coalition v. City of Philadelphia*, 414 F.Supp. 611, 613 (E.D.Pa.1976) ("If anything is clear in the area of freedom of expression, it is that two parades cannot march on the same street simultaneously and the city may allow only one."), *aff'd*, 538 F.2d 322 (3d Cir.1976).

■ ILGO argues that the NYPD could accommodate ILGO's parade in the middle of the St. Patrick's Day Parade preparations if it were required to do so. ILGO argues that sufficient police, sanitation, medical, and other city services were available to devote to the modest parade ILGO seeks to conduct. It is apparent, however, that the particular parade permit ILGO sought would directly conflict with the march of the 69th Regiment and with the police and traffic control preparations for the St. Patrick's Day Parade. The First Amendment does not require the least restrictive or least intrusive means for regulating the time, place, and manner of protected speech. *See Rock Against Racism*, 491 U.S. at 798, 109 S.Ct. at 2757–58 ("[W]e reaffirm today that a regulation of the time, place, or manner of protected speech must be narrowly tailored to serve the government's legitimate, content-neutral interests but that it need not be the least restrictive or least intrusive means of doing so."); *Turley v. New York City Police Dep't*, No. 93 Civ. 8748, 1996 WL 93726, at *6 (S.D.N.Y. Mar. 5, 1996) (Schwartz, J.). As Judge Keenan did last year, the Court finds that the denial of ILGO's permit was appropriate and narrowly tailored to protect the public safety and well being of the citizens of New York. *ILGO 1995*, 882 F.Supp. at 320.

**D.**

■ The third and final inquiry is the provision of alternative means of expression. The City maintains that it is prepared to offer ILGO alternative parade dates and locations. The City also represents that it is

prepared to fashion stationary protest areas along the parade route to allow ILGO to conduct its protest in close proximity to the Parade itself. Specifically, the City has offered prominent areas along the parade route for the protests—on the west side of Fifth Avenue between 58th and 59th Street, and on the east side between 65th and 66th Street, just beyond the reviewing stand. Indeed, the City has said that it would be prepared to recommend approval of an ILGO permit for a parade on March 17, 1996, St. Patrick's Day. ILGO argues that none of these alternatives afford a meaningful opportunity to express either its members' pride in being Irish lesbian and gay men, or its condemnation of the AOH for excluding ILGO from the St. Patrick's Day Parade that AOH sponsors.

■ Whether ample alternatives are available does not depend on the preference of the speaker for one method or another. ILGO has no constitutionally protected franchise on the forum of its choice. *See Heffron v. International Soc'y For Krishna Consciousness*, 452 U.S. 640, 647, 101 S.Ct. 2559, 2563–64, 69 L.Ed.2d 298 (1981); *Harm Reduction Coalition v. Bratton*, No. 95 Civ. 3171, 1995 WL 271766, at *2 (S.D.N.Y. May 9, 1995) (Preska, J.) ("The fact that plaintiffs are dissatisfied with the alternative route offered ... does not make the restriction imposed unconstitutional."); *ILGO 1995*, 882 F.Supp. at 320; *Gay Veterans Ass'n, Inc. v. The American Legion—New York County Org.*, 621 F.Supp. 1510, 1517 (S.D.N.Y.1985) (denial of permit to march on requested route was not constitutional violation where alternate routes were available). *See also Concerned Jewish Youth v. McGuire*, 621 F.2d 471, 474 (2d Cir.1980) ("We do not think that the First Amendment guarantees news publicity for speakers, nor does it guarantee the continued fervor of one's fellow demonstrators."), *cert. denied*, 450 U.S. 913, 101 S.Ct. 1352, 67 L.Ed.2d 337 (1981).

The evidence in this case is that there are ample alternatives available both with respect to a parade and a protest. There are at least three other parades scheduled in celebration of St. Patrick's Day at several locations in New York City on days other

than March 16th. Two are scheduled on March 17, 1996, and one for March 24, 1996. (Centamore Test., Tr. at 91.) Chief Hoehl testified that St. Patrick's Day itself, March 17th, would be available for an ILGO parade. (Hoehl Test., Tr. at 178.) Moreover, the City has offered two prominent locations for ILGO to protest specifically during the St. Patrick's Day Parade on the route of the parade. The Court finds that there are many alternatives readily available to ILGO to express its message, and the City's denial of ILGO's parade permit leaves these options open.

Accordingly, the City's denial of ILGO's parade permit application is a constitutional time, place, and manner restriction on ILGO's First Amendment rights. Because ILGO has not demonstrated even a likelihood of success on the merits of its as-applied challenge to the 1996 permit denial, it is not appropriate to grant ILGO a preliminary injunction on that claim.

### III.

ILGO also challenges the facial constitutionality of Section 10–110 of the New York City Administrative Code, the permitting ordinance under which the Police Commissioner derives the authority to regulate parades. ILGO argues that the ordinance delegates unfettered discretion to city officials and is unconstitutionally overbroad. I find that ILGO has not shown a clear or substantial likelihood of success on this claim.

### A.

"It is well established that in the area of freedom of expression an overbroad regulation may be subject to facial review and invalidation, even though its application in the case under consideration may be constitutionally unobjectionable." *Forsyth County, Georgia v. The Nationalist Movement,* 505 U.S. 123, 129, 112 S.Ct. 2395, 2400–01, 120 L.Ed.2d 101 (1992). Parade permitting ordinances, while permissible, *see Cox v. New Hampshire,* 312 U.S. 569, 574–576, 61 S.Ct. 762, 765–766, 85 L.Ed. 1049 (1941), must not delegate overly broad discretion to a government official, *see Shuttlesworth v. City of Birmingham,* 394 U.S. 147,

153, 89 S.Ct. 935, 940, 22 L.Ed.2d 162 (1969); *Kunz v. People of State of New York,* 340 U.S. 290, 294, 71 S.Ct. 312, 315, 95 L.Ed. 280 (1951), and must otherwise comport with the traditional requirements for reasonable time, place, or manner restrictions. *See Forsyth County,* 505 U.S. at 130, 112 S.Ct. at 2401. When conducting an evaluation of a facial challenge to a permitting ordinance, the Court must consider "the [defendant's] authoritative constructions of the ordinance, including its own implementation and interpretation of it." *Id.,* 505 U.S. at 131, 112 S.Ct. at 2402. *See City of Lakewood v. Plain Dealer Publishing Co.,* 486 U.S. 750, 770, 108 S.Ct. 2138, 2151, 100 L.Ed.2d 771 (1988) ("The doctrine requires that the limits the city claims are implicit in its law be made explicit by textual incorporation, binding judicial or administrative construction, or well-established practice."). *See also Rock Against Racism,* 491 U.S. at 795, 109 S.Ct. at 2755–56 ("Administrative interpretation and implementation of a regulation are, of course, highly relevant to our analysis, for '[i]n evaluating a facial challenge to a state law, a federal court must ... consider any limiting construction that a state court or enforcement agency has proffered.'" (quoting *Village of Hoffman Estates v. Flipside, Hoffman Estates, Inc.,* 455 U.S. 489, 494 n. 5, 102 S.Ct. 1186, 1191, n. 5, 71 L.Ed.2d 362 (1982)).

ILGO has raised serious questions with respect to some aspects of the City's permitting ordinance and the NYPD's interpretation of it as reflected in Admin. Guide P. 321–14 and the understanding of those responsible for granting or denying permit applications. For example, ILGO points to the lack of a written requirement that the City respond to an application within a given time or provide reasons for the denial that would be subject to judicial review. They further argue that the standards in this regulation are too vague to limit discretion. *See, e.g., Riley v. National Fed'n of the Blind of North Carolina, Inc.,* 487 U.S. 781, 802, 108 S.Ct. 2667, 2680–81, 101 L.Ed.2d 669 (1988) (holding licensing scheme unconstitutionally overbroad where history of practice did not establish constraint on government official's discretion).

The City responds that its consistent administrative construction and well-established practice cures any problems. For example, the City argues that the NYPD does respond to applicants in a reasonable time after a permit application is submitted, and that this response is required by the Admin. Guide P. 321–14 which states that the applicant for a disapproved permit must be contacted and that the Police Department is to "initiate discussion, and seek to accommodate the applicant with an alternate time or location for the parade, if feasible." (Pl.'s Ex. 5, ¶ 13; Defs.' Ex. 1, ¶ 13.) This could only be done if the applicants received sufficient advance notice of disapproval. The City also argues that the reasons for the denial of a permit are stated on the endorsement to the parade permit application and is a Departmental record. In this case the endorsements indicated that the reason for the denial of the permit was a conflict with a previously scheduled event. Moreover, the City argues that under the Administrative Code it must grant a permit unless, after investigation, the police commissioner concludes that the parade will be "disorderly in character or tend to disturb the public peace." Admin.Code. § 10–110(a)(1). The City argues that this policy is consistently administered to deny permits in only limited circumstances based on objective factors such as traffic and safety problems, and whether two parades will conflict in time and place.

The issue of the administration of the statute is one that must await full development of the factual record. There was only a limited opportunity to develop the testimony with respect to a well-established practice, if any, because of the time constraints attendant to the motion for a preliminary injunction. It cannot be said at this time that ILGO has established a clear likelihood of success on this claim.

### B.

There are two additional reasons that ILGO has not demonstrated a clear likelihood of success on its facial challenge. First, the City has asserted both res judicata and collateral estoppel as bars to ILGO's facial challenge, arguing that this issue was fully litigated and decided before Judge Keenan. Second, even if ILGO were to overcome the preclusive effect of last year's decision, it would still not be entitled to preliminary injunctive relief in light of the fact that the regulation of ILGO's speech in this case was a reasonable time, place, and manner restriction that the Court would not disturb.

The City's collateral estoppel and res judicata arguments with respect to ILGO's facial challenge to § 10–110 are persuasive given the record at this time. The City argues that ILGO presented its facial challenge to § 10–110 in its action before Judge Keenan, and his disposition of the action both actually and necessarily decided the issue of the permitting ordinance's facial validity against ILGO.

As described above, collateral estoppel bars relitigation of issues fully and fairly litigated in a prior action that were necessarily decided. Res judicata, on the other hand, bars subsequent litigation of "any ground of recovery that was available in the prior action, whether or not it was actually litigated or determined." *Balderman,* 870 F.2d at 62. *See Parklane Hosiery Co., Inc. v. Shore,* 439 U.S. 322, 326 n. 5, 99 S.Ct. 645, 649 n. 5, 58 L.Ed.2d 552 (1977) (describing standard for both res judicata and collateral estoppel). In the present case, both doctrines may bar ILGO's challenge to the permitting ordinance for overbreadth.

In 1995, ILGO began its litigation against the City by bringing a Petition for relief under Article 78 of the New York Civ.Prac.L. & R. That petition, brought by order to show cause, sought to compel the NYPD to respond to ILGO's permit application, enjoin the NYPD from denying ILGO's parade permit, and permanently enjoin the NYPD from denying ILGO such a permit in the future. (*See* Affidavit of Virginia Waters, sworn Mar. 7, 1996, Ex. E.) The City removed the action to the United States District Court where it came before Judge Keenan. The petition was deemed a Complaint with a motion for a preliminary injunction. (*See* Waters Aff., Ex. T at 5.) In papers submitted to Judge Keenan in support of the motion for

a preliminary injunction, ILGO plainly challenged the facial validity of § 10–110:

> The Defendants have shown that they have the unbridled discretion to allow or disallow a march to take place in spite of the regulations set forth in this section of the Administrative Code. This type of unbridled discretion is a prior restraint, and may result in censorship, [*City of Lakewood*] One cannot presume that such unbridled discretion will be exercised in a legal manner.... The record reflects that the NYPD has ignored this section in the past.... Accordingly, that section of the Administrative Code which grants the Defendants the power to deny the exercise of First Amendment rights must be found to be unconstitutional as a matter of law both in general and in its application to the matter at bar.

(Waters Aff., Ex. Q at 14.)

In his decision, Judge Keenan set forth the permitting ordinance in full and held that the City's denial of ILGO's 1995 permit application pursuant to § 10–110 was a constitutional restriction of ILGO's First Amendment rights. Judge Keenan denied ILGO's motion for a preliminary injunction and dismissed the Complaint. *See ILGO 1995*, 882 F.Supp. at 321. After the Court of Appeals affirmed the denial of preliminary relief, *ILGO 1995*, 52 F.3d 311 (2d Cir.1995), a judgment was entered dismissing ILGO's complaint. (*See* Waters Aff.Ex. W.) In light of ILGO's presentation of the challenge to the ordinance, and the necessity that the permitting ordinance be valid in order for a valid time, place, and manner restriction to be imposed under its authority, the City's argument that Judge Keenan necessarily decided the issue is a strong one.

■ At least as strong is the City's argument that res judicata bars ILGO's challenge to the overbreadth of § 10–110. ILGO argues that its facial challenge in this action is based on the City's denial of its parade permit application for 1996. But unlike the as-applied challenge relating to the 1996 permit, the facial challenge is no different today than it was when ILGO challenged the 1995 permit process. The material changes in traffic conditions or time for starting the ILGO

protest parade are not relevant to the issue of whether § 10–110, the Admin. Guide P. 321–14, and the NYPD's past practices comport with the requirements of the First Amendment—that issue remains on the same legal footing as it would have had during the 1995 lawsuit. Moreover, it is well-established that a plaintiff need not be rejected for a permit or even apply for one to challenge a permitting scheme as overbroad. *See City of Lakewood*, 486 U.S. at 755–56, 108 S.Ct. at 2143 ("[O]ur cases have long held that when a licensing statute allegedly vests unbridled discretion in a government official over whether to permit or deny expressive activity, one who is subject to the law may challenge it facially without the necessity of first applying for, and being denied, a license."); *Freedman v. Maryland*, 380 U.S. 51, 56, 85 S.Ct. 734, 737, 13 L.Ed.2d 649 (1965) ("[I]t is well established that one has standing to challenge a statute on the ground that it delegates overly broad licensing discretion to an administrative office, whether or not his conduct could be proscribed by a properly drawn statute, and whether or not he applied for a license."). Consequently, there was no need for ILGO to apply for a 1996 parade permit to challenge Administrative Code § 10–110 as unconstitutional on the basis of unfettered discretion. That claim should have been litigated fully in the action before Judge Keenan, and res judicata would bar ILGO from asserting it now. *See Balderman*, 870 F.2d at 62 ("Res judicata ... prevents the subsequent litigation of any ground of recovery that was available in the prior action, whether or not it was actually litigated or determined.")

The strength of the City's preclusion arguments effectively undermines ILGO's effort to demonstrate a likelihood of success on the merits of its facial challenge to the New York City permitting scheme. Accordingly, ILGO has not satisfied the standard required to warrant a preliminary injunction based on its claim that § 10–110 is unconstitutionally overbroad.

### C.

■ Even if ILGO had demonstrated a clear or substantial likelihood of success on the merits of its overbreadth claim, or indeed

any likelihood of success, there is an additional obstacle to injunctive relief. Having already found that the denial of ILGO's permit application was itself a reasonable time, place, and manner restriction in the circumstances of the 1996 St. Patrick's Day Parade, this Court would not simply declare the permitting scheme unconstitutionally overbroad and grant an injunction requiring that ILGO's permit be granted. Rather, this Court would follow the approach indicated by the Court of Appeals for the Second Circuit in *Olivieri v. Ward*, 801 F.2d 602 (2d Cir. 1986). The Court of Appeals explained that:

> Ordinarily, a court would simply rule on the constitutional validity of the restraints imposed and refrain from devising its own plan. Yet here time constraints forced the district court—and this Court, too—to choose between striking down defendants' [restriction] or deferring to government imposed limitations on First Amendment rights. Neither alternative was desirable: to choose the former risks ignoring public safety concerns because demonstrators and counterdemonstrators would at the same time occupy the [forum]; by choosing the latter, a court abdicates its independent responsibility to examine the constitutionality of First Amendment restrictions—it simply adopts them. The scheme devised by the district court steered a middle course between these extremes—limiting [plaintiff]'s members, yet upholding the exercise of their communicative rights. Obviously under such circumstances courts must and do have the power to rule in this fashion.

*Olivieri*, 801 F.2d at 606. Judge Leisure relied on *Olivieri* to fashion conditions for a preliminary injunction granted to demonstrators who had been denied permission to conduct a demonstration near Gracie Mansion. *See New Alliance Party v. Dinkins*, 743 F.Supp. 1055, 1067 (S.D.N.Y.1990).

Under the circumstances of this case, the most appropriate preliminary injunction would not include a permit to conduct a protest parade along the St. Patrick's Day Parade route. The injunction would be limited to the relief I have already found to comport with reasonable time, place, or manner restrictions—specifically, the alternatives of a parade on a different date or location, or

a stationary protest at the two locations the City has represented would be available, alternatives already available to ILGO. To grant preliminary injunctive relief any more generous would reward ILGO beyond what is constitutionally warranted. Indeed, such relief would threaten to encroach upon the First Amendment rights of the AOH—rights that are firmly established by law, *see Hurley v. Irish–American Gay, Lesbian & Bisexual Group of Boston*, —— U.S. ——, 115 S.Ct. 2338, 132 L.Ed.2d 487 (1995), *New York County Bd. of Ancient Order of Hibernians v. Dinkins*, 814 F.Supp. 358, 370 (S.D.N.Y. 1993) (Duffy, J.) ("One thing is certain, however, no one can force the inclusion of ILGO in the AOH parade."). To require the parade permit ILGO seeks would threaten public safety by permitting a parade which would directly conflict with another parade and directly interfere with the necessary public preparations for that parade.

Accordingly, even if ILGO had demonstrated a likelihood of success with respect to the constitutionality of § 10–110 on its face, ILGO would not be entitled to the preliminary injunction it seeks.

### IV.

■ Finally, even if the Court were to apply the mildest test for granting a preliminary injunction, the balance of equities would tip decidedly in favor of the City. As Judge Keenan found last year, the City's legitimate interest in preserving public order outweighs any hardship ILGO suffers by not being able to hold its protest parade at its preferred time and place. There are ample alternative means by which ILGO may express its message without jeopardizing public order, while a Court order requiring the City to grant ILGO a parade permit would assuredly do so.

Moreover, ILGO is guilty of laches for failing to bring the lawsuit earlier when the position of the parties could be thoroughly presented. This delay weighs strongly in the balance against granting equitable relief. *See WPIX v. League of Women Voters*, 595 F.Supp. 1484, 1494 (S.D.N.Y.1984) (Sofaer, J.) (denying preliminary injunction request by television station to broadcast presidential debate in part because "WPIX's eleventh-hour demand for access has also unjustly

burdened the [defendant] with the task and expense of responding to a set of difficult legal issues on short notice.... [Plaintiff]'s unnecessary delay in asserting its rights ... impinges on the League's legitimate interests in security and safety").

At least with regard to its facial challenge, ILGO has offered no defensible reason for waiting until nineteen days before the parade to initiate this action for injunctive relief. Even with respect to its as-applied challenge, Maguire testified that ILGO was contemplating legal action relating to the 1996 parade as early as late December 1995. On January 25, 1996, ILGO received notification that the person in charge of permit processing at Patrol Borough Manhattan South, Lieutenant Cirillo, would be recommending disapproval. Nevertheless, ILGO remained silent. That delay has prejudiced both the City and AOH in the preparation and presentation of their respective cases.

ILGO has been a party to nearly every suit in this Court between these parties regarding this parade, beginning with the action before Judge Leval who expressly criticized ILGO's failure to bring its action in a more timely fashion. *See ILGO 1992*, 788 F.Supp. 172, 175 (S.D.N.Y.1992). ILGO did not file its Article 78 petition last year until February 23, 1995, requiring an accelerated hearing before Judge Keenan and an expedited appeal on the briefs prepared for the preliminary injunction motion. In spite of this history and fair warning, ILGO waited until February 26, 1996 to file this year's lawsuit. Though perhaps not rising to the level of unconscionability, *see New Era Publications Int'l, ApS v. Henry Holt and Co., Inc.,* 873 F.2d 576, 584–5 (2d Cir.1989), *cert. denied,* 493 U.S. 1094, 110 S.Ct. 1168, 107 L.Ed.2d 1071 (1990), ILGO's delay is one of the equities that argues strongly against granting it a preliminary injunction.

## CONCLUSION

For the foregoing reasons, ILGO's motion for a preliminary injunction is **denied.**

**SO ORDERED.**