The **IRISH LESBIAN AND GAY ORGANIZATION, Plaintiff,**

v.

William P. **BRATTON, Police Commissioner; The New York City Police Department; The City of New York; and Rudolph Giuliani, Mayor, Defendants.**

No. 95 Civ. 1440 (JFK).

United States District Court, S.D. New York.

March 15, 1995.

Paul O'Dwyer, New York City (Mary D. Dorman, of counsel), for plaintiff.

The New York Civil Liberties Union, New York City (Arthur N. Eisenberg, Norman Siegel, of counsel), for amicus curiae.

Paul A. Crotty, Corp. Counsel of City of New York, New York City (Lorna Goodman, Florence Hutner, Peter H. Moulton, of counsel), for defendants.

The New York County Bd. of Ancient Order of Hibernians, New York City (John P. Hale, of counsel), for amicus curiae.

## OPINION AND ORDER

KEENAN, District Judge:

The Irish Lesbian and Gay Organization ("ILGO") seeks an injunction compelling the Police Commissioner and the City of New York to issue ILGO a parade permit to march from 42nd Street to 86th Street on 5th Avenue beginning at 8:30 a.m. on Friday March 17, 1995, St. Patrick's Day. The City has denied ILGO's application for a permit. ILGO maintains that this denial violates plaintiff's constitutional rights. This action was commenced in the New York State Supreme Court in New York County on February 23, 1995. Defendants removed the action to this Court on March 1, 1995. Plaintiff sought to remand the matter to state court.

The remand application was heard by this Court on March 8, 1995 and denied. Jurisdiction rests in Federal Court inasmuch as this is a matter involving a federal constitutional issue. An evidentiary hearing was held before this Court on March 10, 1995 and final briefs were submitted on March 13, 1995.

## FINDINGS OF FACT

The St. Patrick's Day Parade (the "Parade") is an annual event which has been held in New York City for 234 years. See New York County Board of the Ancient Order of Hibernian's (the "AOH") Brief, at 1. For over seventy years, the parade has been held on 5th Avenue. It starts north from 42nd Street at 11:00 a.m. on March 17th of each year. The AOH has applied for and received a Parade permit authorizing it to conduct the Parade on 5th Avenue again this year.

For the six years since its formation in 1990, ILGO has sought, with generally unsatisfactory results from their point of view, to either march in the Parade or to have their own parade on the same day, on the same route, and at approximately the same time. ILGO's avowed purpose for its parade is to celebrate the Irish cultural heritage and homosexuality of its members. ILGO had applied for a permit to march on Fifth Avenue on March 17, 1995 immediately prior to the AOH parade. The Police Department denied ILGO the permit under the authority of section 10–110 of the Administrative Code of the City of New York. Section 10–110 reads in its entirety:

§ 10–110 Processions and parades.

a. Permits. A procession, parade, or race shall be permitted upon any street or in any public place only after a written permit therefore has been obtained from the police commissioner. Application for such permit shall be made in writing, upon a suitable form prescribed and furnished by the department, not less than thirty-six hours previous to the forming or marching of such procession, parade or race. The commissioner shall, after due investigation

of such application, grant such permit subject to the following restrictions:

1. It shall be unlawful for the police commissioner to grant a permit where the commissioner has good reason to believe that the proposed procession, parade, or race will be disorderly in character or tend to disturb the public peace;

2. It shall be unlawful for the police commissioner to grant a permit for the use of any street or any public place, or material portion thereof, which is ordinarily subject to great congestion or traffic and is chiefly of a business or mercantile character, except, upon loyalty day, or upon those holidays or Sundays when places of business along the route proposed are closed, or on other days between the hours of six-thirty post meridian and nine ante meridian;

3. Each such permit shall designate specifically the route through which the procession, parade or race shall move, and it may also specify the width of the roadway to be used, and may include such rules and regulations as the police commissioner may deem necessary;

4. Special permits for occasions of extraordinary public interest, not annual or customary, or not so intended to be, may be granted by the commissioner for any street or public place, and for any day or hour, with the written approval of the mayor;

5. The chief officer of any procession, parade or race, for which a permit may be granted by the police commissioner, shall be responsible for the strict observance of all rules and regulations included in said permit.

b. Exemptions. This section shall not apply:

1. To the ordinary and necessary movements of the United States army, United States navy, national guard, police department and fire department; or

2. To such portion of any street as may have already been, or may hereafter be duly, set aside as a speedway; or

3. To processions or parades which have marched annually upon the streets for more than ten years, previous to July seventh, nineteen hundred fourteen.

c. Violations. Every person participating in any procession, parade or race, for which a permit has not been issued when required by this section, shall, upon conviction thereof, be punished by a fine of not more than twenty-five dollars, or by imprisonment for not exceeding ten days, or by both such fine and imprisonment.

Louis R. Anemone, Chief of the Department of the New York City Police Department, is the highest ranking uniformed officer in the Department. Chief Anemone supplied an affidavit and testified at the hearing on this matter as to the Department's decision to deny the permit to ILGO. Ms. Anne Maguire, an original member of ILGO, testified for the plaintiff.

Chief Anemone pointed out, and the Court recognizes, that this year March 17th falls on a Friday—a weekday—when normal business traffic inevitably becomes ensnarled by the Parade. The usual tens of thousands of people pour into the area as on any other weekday, including commuters into Grand Central Station, residents, visitors, and those who work at the hundreds of businesses in the area. The Parade adds to this normal congestion an estimated additional 120,000 people marching in the Parade and 250,000 spectators who view the Parade from the sidewalks along the route of the march.

Chief Anemone testified compellingly and convincingly that having two parades at nearly the same time on the same route in that area—midtown Manhattan on a business day—would put too much of a strain on City services and Police resources. He pointed out that the traffic congestion was already enormous because of the existing Parade.

Chief Anemone testified that people begin to arrive at St. Patrick's Cathedral between 50th and 51st streets at approximately 8:00 a.m. to attend a Roman Catholic mass. The mass begins at 8:30 a.m. and ends at 9:30 a.m. Approximately 3000 people attend the mass including uniformed members of the 69th Regiment of the National Guard. At the end of the service, the 69th Regiment marches down 5th Avenue to 44th Street. At this point, the two eastern most lanes of

5th Avenue are closed to vehicular traffic. Many of the others at the mass proceed to staging areas to the east and west of 5th Avenue on the side streets from 44th to 48th streets. The permit issued to the AOH for the Parade tacitly allows for all of these activities. *See* March 10, 1995 Hearing Transcript, at 80.

Chief Anemone testified that no group, regardless of its nature or purpose, would be issued a permit for a second parade on 5th Avenue on St. Patrick's Day, because a second parade held nearly simultaneously[1] and in the same place would result in too much congestion and would create a danger to the health, safety and well being of the citizens in the vicinity. *See* Anemone Aff., ¶ 16. Indeed, on cross-examination Chief Anemone testified that not even the Girl Scouts would be permitted to stage a second parade on 5th Avenue on St. Patrick's Day. *See* March 10, 1995 Hearing Transcript, at 71, 78.

Plaintiff and plaintiff's witness Ms. Maguire urge that Chief Anemone's concerns about congestion and public health and safety are pretextual. They claim that ILGO was denied a permit because of homophobia, particularly the homophobia held by the Police Department. In his sworn testimony Chief Anemone disputed this claim, stating that

> the denial of ILGO's permit had nothing to do with the content of ILGO's speech or the sexual orientation of its members. I take my oath of office seriously and apply the law without regard to sexual orientation.

Anemone Aff., ¶ 16.

Moreover, the Court finds that Ms. Maguire's testimony confirms Chief Anemone's concerns over additional congestion and burdens on City services—including not only the Police but the Fire Department, traffic control officers, emergency services and sanitation services—that would result from a second parade. Ms. Maguire testified that she would expect 1500 to 1700 marchers in an ILGO parade which would march up 5th Avenue precisely as the 69th Regiment marches down the Avenue. In addition, in paragraph 20 of her affidavit Ms. Maguire stated that

> it is only by being seen on 5th Avenue on March 17th that we can express both our cultural heritage and pride, our visibility within our community and our outrage at our exclusion from the Parade. The reason ILGO want [sic] to be on 5th Avenue between 42nd and 59th Streets is because no other location will allow us to reach our target audience—*the parade participants, who line up in the side streets between 44th Streets and 59th Streets, and the Parade spectators, who line up between 44th and 59th Streets on 5th Avenue well in advance of the Parade.*

(emphasis added). From this testimony it appears to the Court that it is the congestion on and around the Avenue itself that drives ILGO to seek a permit to march on that route on that day and to reject the idea of a march on any other route or date. *See, e.g.,* Maguire Aff., ¶ 8 (stating that on St. Patrick's Day in 1992 when ILGO conducted a protest march from 59th Street to 68th Street at 10:00 a.m., "[t]here was no opportunity for the protest march to be seen by the Parade supporters who gather between 44th Street and 59th Street to observe the parade, nor was there any opportunity to be seen by the Parade participants who line up on the side-streets between 44th Street and 59th Street in advance of the Parade.")

### CONCLUSIONS OF LAW

**I. *Preliminary Injunction Standards***

To obtain a preliminary injunction in this Circuit, the moving party has the burden of showing (a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting preliminary relief. *See Citibank, N.A. v. Citytrust,* 756

---

1. On the afternoon of March 13, 1995 at the last Court appearance, the plaintiff for the first time announced a willingness to begin its parade at 10:00 a.m. on the morning of St. Patrick's Day instead of 8:30 a.m. as originally stated. Rather than relieve the situation, however, that will only exacerbate it because then there would be literally two parades marching simultaneously on the same avenue.

F.2d 273, 275 (2d Cir.1985) (quoting *Bell & Howell: Mamiya Co. v. Masel Supply Co., Corp.,* 719 F.2d 42, 45 (2d Cir.1983) (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979))).

## II. *Irreparable Harm*

◼ As an initial matter, the Court finds that plaintiff has adequately demonstrated the potential for irreparable harm. " 'The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.' " *Gay Veterans Association, Inc. v. American Legion,* 621 F.Supp. 1510, 1515 (S.D.N.Y.1985) (quoting *Elrod v. Burns,* 427 U.S. 347, 373, 96 S.Ct. 2673, 2690, 49 L.Ed.2d 547 (1976)). In the absence of an injunction, the plaintiff will not be able to conduct its protest parade on 5th Avenue on St. Patrick's Day and thus will not be able to declare its message. Such an injury will be irreparable. The issue for the Court to determine therefore is whether plaintiff can demonstrate a likelihood of success on the merits, or sufficiently serious questions on the merits with the balance of hardships tilting in plaintiff's favor.

## III. *The Merits*

◼ There is no question that ILGO has a First Amendment right to proclaim its message of pride in its Irish cultural heritage and in its homosexuality. But this right is not absolute. *See Olivieri v. Ward,* 801 F.2d 602, 605 (2d Cir.1986), *cert. denied,* 480 U.S. 917, 107 S.Ct. 1371, 94 L.Ed.2d 687 (1987); *Concerned Jewish Youth v. McGuire,* 621 F.2d 471, 473 (2d Cir.1980), *cert. denied,* 450 U.S. 913, 101 S.Ct. 1352, 67 L.Ed.2d 337 (1981). First Amendment rights are subject to reasonable time, place and manner restrictions to further significant government interests. *See Olivieri,* 801 F.2d at 605. It is axiomatic that a restriction on First Amendment rights must:

(1) be content-neutral,

(2) be narrowly tailored to meet a significant governmental interest, and

(3) leave open ample alternative means of communication.

*Olivieri,* 801 F.2d at 605 (citing *Clark v. Community for Creative Non–Violence,* 468

U.S. 288, 293, 104 S.Ct. 3065, 3069, 82 L.Ed.2d 221 (1984)). *See also Ward v. Rock Against Racism,* 491 U.S. 781, 791, 109 S.Ct. 2746, 2753–54, 105 L.Ed.2d 661 (1989).

### A. *Content Neutral*

◼ The Court finds that the decision to deny ILGO's permit application is content neutral. Section 10–110 of the Administrative Code is obviously, from a reading thereof, itself content neutral.

In applying the Code, New York City and Police Department representatives met with ILGO representatives on February 27th, 1995 to discuss the possibility of arranging mutually acceptable accommodations. ILGO refused to consider alternatives to marching up 5th Avenue from 42nd Street to 86th Street on St. Patrick's Day. This refusal is confirmed by a fair reading of the Maguire affidavit, paragraph 20, quoted above.

As to plaintiff's claim of pretext and homophobia, the Court finds no evidence of political concern, bias or content-based motivation by the defendants collectively, or any one of them, in denying ILGO's application. There is a mountain of credible testimony about serious public safety concerns, including enormous traffic congestion, the increased burden on emergency services, and the general disorderly conduct that frequently accompanies an event of this magnitude.

Addressing plaintiff's charge of homophobia specifically, the City points out in its brief, and Chief Anemone in his testimony illustrated, there is an annual Gay Pride Parade in Manhattan which the Police Department polices. Plaintiff offered no evidence or suggestion that the Gay Pride Parade has been refused a permit because of Police Department homophobia. Nor has plaintiff contended that the police in any way disparage or discourage the marchers in the Gay Pride Parade. Faced with these uncontested facts, and an absence of contrary evidence regarding the current permit application, the Court finds that the decision to deny ILGO's permit application is content neutral.

### B. *Narrowly Tailored for Significant Governmental Interest*

◼ This Court and the Supreme Court have found that "society's interests in order

dictate that all groups seeking to parade cannot do so at the same time or place." *Gay Veterans Association, Inc. v. American Legion,* 621 F.Supp. 1510, 1517 (S.D.N.Y. 1985). "Two parades cannot march on the same street simultaneously, and government may allow only one." *Grayned v. City of Rockford,* 408 U.S. 104, 115–16, 92 S.Ct. 2294, 2303, 33 L.Ed.2d 222 (1972).

In a different context, Mr. Justice Frankfurter wrote:

> [w]e must be mindful of the enormous difficulties confronting those charged with the task of enabling the polyglot millions in the City of New York to live in peace and tolerance.

*Niemotko v. Maryland,* 340 U.S. 268, 284, 71 S.Ct. 328, 334, 95 L.Ed. 280 (1951). This was quoted in *Concerned Jewish Youth v. McGuire,* 621 F.2d 471, 477 (2d Cir.1980), *cert. denied,* 450 U.S. 913, 101 S.Ct. 1352, 67 L.Ed.2d 337 (1981), by Second Circuit Judge Moore who noted that "the government interest in providing security [and] safety ... may, at times, be superior to asserted First Amendment rights." *Id.* at 474.

What Justice Frankfurter wrote 44 years ago about the complex and difficult task of governing and providing for the public safety of the millions who reside in and commute to New York City, especially on a business day, is even more compelling today. There are more automobiles, with more attendant congestion, and no more space than there existed over four decades ago.

Under the City Charter, the Police Department must "preserve the public peace ... regulate, direct, control and restrict the movement of vehicular and pedestrian traffic." N.Y.C. Charter, § 435(a). Again, representatives of the City and the Police De-

partment attempted to arrange mutually acceptable accommodations, but ILGO refused to consider alternatives to marching up 5th Avenue from 42nd Street to 86th Street on St. Patrick's Day. Insofar as the Court finds that absolute chaos would reign on 5th Avenue if a second parade were to be permitted, the Court finds that the Police Department's denial of a second permit is appropriate and narrowly tailored to protect the public safety and well being of the citizenry of New York.

#### C. *Alternative Means of Communication*

■ As discussed above, the Court finds that the decision to deny the second parade permit content-neutral and narrowly tailored to serve a legitimate concern expressed by those charged with the public safety. The Court also finds that there are more than adequate other means for ILGO to communicate the same message on another day. ILGO has no First Amendment right to carry its message to the same audience that will gather to march in and watch the St. Patrick's Day Parade. *Cf. Concerned Jewish Youth,* 621 F.2d at 474 (discounting demonstrators' concerns about their own assessment of "success" of demonstration or interest of press in covering protest at different location). ILGO can conduct a parade and trumpet its message on another day. Indeed, Irish history, tradition and culture are not so drab and sterile as to permit of only one hero—St. Patrick.[2] Over the centuries, there have been scores of Irish heroes whose lives, writings and deeds ILGO could honor and recognize to further their celebration of Irish "cultural heritage and pride." Some of them, like Patrick, were born in other lands, while many were born in Ireland.[3] More-

---

2. Patrick was not even born in Ireland, but in the western part of Roman Britain late in the 4th century. He was kidnapped and hauled to the Emerald Isle by brigands who sold him into slavery. There is no evidence that he was even born on March 17th.

3. Without being presumptuous, let me list a mere half-dozen whose birth dates and lives ILGO could celebrate to carry their message and views by way of an ILGO parade on a date other than March 17th: Michael Collins, born County Cork, October 16, 1890; Eamon de Valera, born New

York City, October 14, 1882; James Joyce, born Dublin, February 2, 1882; Charles Stewart Parnell, born County Wicklow, June 27, 1846; George Bernard Shaw, born Dublin, July 26, 1856; Oscar Wilde (himself a victim of persecution and prejudice in his time because of a homosexual relationship), born Dublin, October 16, 1854. The proximity of the birth dates of Collins, de Valera and Wilde is particularly striking. Why not a parade on the weekend nearest to their birth dates?

Of course, by suggesting these six the Court does not wish to ignore the accomplishments of

over, there is no "heckler's veto" here as plaintiff suggests. Rather, there is only the clear and simple fact that two parades cannot be held simultaneously (for all practical purposes) on the same day, on the same part of the same Avenue without unreasonably increasing the risks to public safety and well-being, as determined by those charged with the regulation, direction and control of the public streets.

ILGO has failed to demonstrate either a likelihood of success on the merits or sufficiently serious questions going to the merits such that an injunction is warranted. The merits are clear. It is therefore unnecessary to balance the hardships, although in the Court's view, such balance would favor of the defendants. The defendants' interest in preserving the public order outweighs any hardship to plaintiff suffered by not being able to hold its protest parade at its preferred place and time. The Court concludes that the denial of a permit to ILGO was a legitimate time, place and manner restriction in furtherance of the City's significant interest in preserving the public order. ILGO is therefore not entitled to the injunction that it seeks.

## IV. *The Counterclaims*

■ This Court has denied plaintiff's application for a preliminary injunction. The counterclaims asserted by defendants are pendent state claims. As such, they are hereby dismissed pursuant to this Court's discretion under 28 U.S.C. section 1367(c)(3). That section vests the Court with discretion to dismiss remaining state claims after dismissing those claims over which it had original jurisdiction. *See* 28 U.S.C. § 1367(c)(3). The subject of defendants' proposed injunction is better addressed to a state tribunal. Where federal claims are disposed of well before trial, it is appropriate for the pendent state claims to be dismissed as well. *See Nolan v. Meyer*, 520 F.2d 1276, 1280 (2d

Cir.), *cert. denied,* 423 U.S. 1034, 96 S.Ct. 567, 46 L.Ed.2d 408 (1975).

### *CONCLUSION*

ILGO's application for a preliminary injunction is denied. The counterclaims are dismissed. The Court orders this case closed and directs the Clerk of Court to remove it from the Court's active docket.

## SO ORDERED.

St. Brendan (Brenainn) who may well have discovered America 950 years before Columbus; or Brian Boru, the legendary medieval Irish King of the whole island; or Edmund Burke, the great statesman and philosopher of the 18th century; or Daniel O'Connell, the "liberator" of the first half of the 19th century; or Jonathan Swift, the 18th century creator of "Gulliver's Travels"; or Wolf Tone, who is considered the "father of Republicanism" in the late 18th century; or William B. Yeats, the wonderful poet who wrote well into this century. There are many others and ILGO could celebrate the accomplishments of these people, some Catholic, some Protestant, without having to disrupt the center of New York City on March 17th. All of them were Irish.